UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
TYRONE HOUSTON, a/k/a TYRONNE          :
BLACK,                                 :
                                       :
                    Plaintiff,         :        11 Civ. 7374 (LAP)
                                       :
          - v. -                       :
                                       :        OPINION AND ORDER
DORA B. SCHRIRO, et al.,               :
                                       :
                    Defendants.        :
------------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

     Tyrone Houston ("Houston" or "Plaintiff"), proceeding pro

se, brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and

1986, asserting violations of his First, Fourth, and Eighth

Amendment rights as well as his right to religious freedom under

the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. § 2000cc et seq.  Before the Court is

Defendants' motion for summary judgment [dkt. no. 101][1] pursuant

to Rule 56 of the Federal Rules of Civil Procedure, which argues

that there is insufficient evidence to support Plaintiff's

claims.  Defendants' motion is GRANTED in part and DENIED in

part.

---

[1] Unless otherwise noted, docket numbers referenced herein are
those assigned to documents in Case No. 11 Civ. 7374.

## I.   BACKGROUND

Houston is an inmate in the custody of the New York State
Department of Corrections and Community Supervision ("DOCCS")
who currently resides at the Five Points Correction Facility in
Romulus, New York ("Five Points").  Between August, 2009 and
November, 2011, the time period relevant to Plaintiff's claims,
Houston was housed at three facilities operated by the New York
City Department of Corrections ("DOC"):  the Anna M. Kross
Center ("AMKC"), the Manhattan Detention Complex ("MDC"), and
the George R. Vierno Center ("GVRC") on Riker's Island.  Houston
initiated this action on October 17, 2011.  (Second Amended
Complaint ("SAC"), [dkt. no. 2].)  On August 20, 2013, Judge
Harold Baer, Jr. granted Defendants' motion to dismiss in part.
Houston v. Schriro, No. 11-CV-7374, 2013 WL 4457375 (S.D.N.Y.
Aug. 20, 2013) [dkt. no. 80].  Six sets of claims survived, each
of which is discussed below.

### A.   Dental Care

Prior to his initial incarceration in August, 2009,
Plaintiff alleges that he visited a dentist who informed him
that surgery was required to treat a broken tooth on the back
left side of his mouth.  (Houston Dep. at 52:6-18.)  In March,
2010, Plaintiff was treated by a DOC dentist, Dr. Brian Martin,
at which point he complained about pain in the upper right side
of his mouth.  (Martin Decl. ¶ 9.)  According to Plaintiff, Dr.

2

Martin determined that he would need to be treated by an outside oral surgeon.  (SAC ¶ 14.)  Based on his review of medical records maintained by Corizon Health Services, Dr. Martin denies referring Houston to an oral surgeon or suggesting that a visit to an oral surgeon was necessary.  (Martin Decl. ¶ 10, Ex. A.) Plaintiff states that he filed complaints requesting to be seen by an oral surgeon and claiming that he was in substantial pain. (SAC ¶ 17.) Plaintiff was never treated by an oral surgeon during his time in DOC custody.

According to DOC records, Houston visited Dr. Martin again on May 10, 2011.  (Martin Decl. Ex. D.)  During this visit, Martin identified a fractured filling in his top left molar. (Id. ¶ 14-15.)  Martin replaced the filling ten days later. (Id. Ex. F.)  Following his transfer to State custody, a dentist at Five Points determined that Houston needed to have five front teeth removed from the top of his mouth.  (Pl's Opp. to Summ. J. ¶ 6, Ex. B.)  Plaintiff claims that Defendants' failure to provide appropriate dental care during his time in DOC custody — specifically, the failure of the Defendants named in this claim[2] to follow up on Dr. Martin's alleged referral to an oral surgeon — led to his need for tooth extractions.  (Id.)

---

[2] Defendants named in this claim are Brian Martin, Artemio Colon, Arthur Harris, Rose Agro, Winette Halyard-Saunders, and Richard Wolf.

B.    Destruction of Property

Plaintiff alleges that Defendants illegally destroyed his property on two occasions. First, Houston claims that on August 30, 2011, he returned from the law library to find water and sewage covering the floor of his cell, submerging some of his documents relevant to this litigation. (Houston Dep. at 187:13-19.)  He alleges that Rutherford Cipio, a DOC plumber, intentionally flooded his cell in retaliation for an earlier complaint to the warden about a lack of running water.  (SAC ¶ 44.)  Plaintiff was informed by an officer as well as other inmates that Cipio had been in his cell. (Houston Dep. at 189:16-25.). He also recalls Cipio giving him a "look" communicating that the flooding had been purposeful.  (Houston Dep. at 192:20-193:16.)  Cipio and Plaintiff had no arguments or interactions of any kind prior to the alleged incident.  (Id.) at 192:22-196:5.  In fact, Plaintiff claims to have "[n]ever said anything to this man in 22 months."  (Id. at 194:9-10.) Cipio denies these allegations, claiming that he has never intentionally flooded an inmate's cell or caused damage to an inmate's property in any manner.  (Cipio Decl. ¶¶ 6-7.)

Second, Plaintiff contends that in March 2010 Yvette Bowers, the AKMC grievance officer, directed prison staff to search his cell and destroy his blood pressure, blood thinning, and glaucoma medication in retaliation for filing a lawsuit

4

against Rosamund Padmore, the grievance program supervisor.
(SAC ¶ 38.) Houston says he was present when several guards
performing an institutional (pre-scheduled) search of his entire
cell block threw his medication on the floor and swept it up
with other trash. (Houston Dep. at 205:5-19.)  He alleges that
he was subsequently treated for a blood clot at Elmhurst
Hospital as a result of his inability to take his medication.
(SAC ¶ 57.)  When he returned from the hospital, Houston says
that Bowers told him he "should have dropped dead." (Houston
Dep. 231:14-24.)  Bowers denies these allegations.  (Bowers
Decl.)  She claims that she is usually unaware of inmates'
medication requirements unless such issues are raised in a
grievance and does not recall learning that an inmate filed a
grievance or lawsuit against Ms. Padmore.  (Id. at ¶¶ 9, 11.)

     C.  Inadequate Footwear

     Plaintiff claims that Defendants were deliberately
indifferent to his need for orthopedic footwear in violation of
the Eighth Amendment.  Houston alleges that his prison-issued
footwear caused him injuries, including gout, swelling, bunions,
and painful corns.  (SAC ¶ 20.)  He claims that he visited a DOC
podiatrist who issued him a pass to obtain workboots on May 4,
2010 and recommended further care from an outside podiatrist.
(Houston Decl. at 124:18-125:25.)  Plaintiff states that he did
not receive workboots until over a year later, at some point

between July and September, 2012, when an officer in the barber
shop helped him to acquire them.  (Id. at 144:11-145:10.)  As a
result of the delay, Houston alleges that his foot injuries
worsened, causing difficulty walking and standing as well as the
need for foot surgery.  (SAC ¶ 55.)  In response, Defendants
claim that Houston was, in fact, seen by a podiatrist and issued
appropriate footwear in a timely manner. In the alternative,
they argue that the alleged denial of footwear does not amount
to a sufficiently serious deprivation of care in violation of
the Eighth Amendment.

    D.   Denial of Low-Sodium Halal Meals

    Plaintiff brings claims under the Free Exercise Clause,
RLUIPA, and the Eighth Amendment related to the alleged denial
of low-sodium meals due to his religion.  When Houston was first
incarcerated, he claims he was placed on a list of inmates to
receive low-sodium halal meals, which he received during his
stay at Riker's Island.  (Houston Dep. at 244:22-245:5.)
Following his transfer to MDC, Houston filed a grievance
alleging that in September, 2010 the MDC dietician informed him
that low-sodium halal meals would no longer be provided,
effectively forcing him to choose between his religious beliefs
and his health.  (Houston Dep. 247:21-248:2; P's Opp. to Summ.
J., Ex I.)  Defendants contend that Plaintiff was never required
to make this decision.  Moreover, even if he was, they argue

6

that Plaintiff did not suffer from a serious medical condition
and that his religious beliefs regarding halal meals were not
sincerely held.

     E.   Strip Searches

     Houston alleges that he was strip searched on six occasions
between August 10, 2011 and August 20, 2011 (Houston Dep. at
270:1-16) in violation of his rights under the Free Exercise
Clause, RLUIPA, and the Fourth Amendment.  He claims that
Officer Webb, a female security captain, observed the searches.
(SAC ¶ 42, 57.)  As a practicing Muslim, Houston maintains that
it is a violation of his religious beliefs for a woman who is
not his wife to view his naked body.  (Id. at 276:14-25.)  He
claims that Webb continued to observe the searches even after he
objected and informed her that such conduct violates his
religious beliefs.  (Id. at 277:19-278:15, 274:9-12.)

     DOC policies prohibit female staff from observing strip
searches of male inmates absent an emergency.  (Hall Decl., Ex.
A at 10.)  Webb denies Houston's allegations.  (Webb Decl. ¶¶
10-13.)  Thomas Hall, former MDC warden, and Artemio Colon,
former deputy warden, claim that they have never witnessed a
female staff member observing male inmates during strip
searches.  (Hall Decl. ¶ 10; Colon Decl. ¶ 20.)  Houston states
that Hall and Colon were "probably" present at four of the six
alleged searches.  (Houston Dep. at 286:4-5.)

According to DOC records, at least two of the six searches were "institutional searches," which are generally scheduled one month in advance by the Deputy Warden of Security. (Webb Decl. Ex. A, Ex. B; Hall Decl. ¶ 8.) The logs for these searches, which were conducted on August 12, 2011 and August 15, 2011, indicate that Webb was not involved in the searches of Houston's cell, although she is listed as the security captain for the August 15th search. (Id.) DOC was unable to uncover records regarding the other four alleged searches. (Webb Dec. ¶ 21.)

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate only if the court concludes that there is no genuine dispute as to the material facts and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under governing law." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (internal quotations and citation omitted). In determining whether there are genuine triable issues, "the court is required to resolve all ambiguities, and to credit all factual inferences that could

rationally be drawn, in favor of the party against whom summary judgment is sought." Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for her motion and identifying portions of the record that demonstrate the absence of a genuine issue of material fact. See, e.g., Celotex, 477 U.S. at 322. In evaluating the movant's initial showing, "the judge must view the evidence through the prism of the substantive evidentiary burden" that would apply at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Thus, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995), citing Celotex, 477 U.S. at 322-23.

If this burden is satisfied, the opposing party must then "produce specific facts indicating that a genuine factual issue exists." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citation omitted). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If, however, the non-movant provides "a reasonable conflicting interpretation

of a material disputed fact," summary judgment must be denied.

Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir. 1983).

     B.   42 U.S.C. § 1983

Plaintiff brings claims against Defendants under 42 U.S.C.
§ 1983, which provides citizens with a private right of action
to safeguard their constitutional rights.  See 42 U.S.C. § 1983.
To succeed on a § 1983 claim, Plaintiff must prove "the
violation of a right secured by the Constitution and laws of the
United States, and must show that the alleged deprivation was
committed by a person acting under color of state law."  West v.
Atkins, 487 U.S. 42, 48 (1998) (citations omitted); see also
Gleason v. Scoppetta, 566 Fed.Apx. 65 (2d Cir. 2014).

The Prison Litigation Reform Act ("PLRA") mandates that
"[n]o action shall be brought with respect to prison conditions
under [§ 1983], or any other Federal law, by a prisoner confined
in any jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted."  42
U.S.C. § 1997e(a).  Prisoners must "properly" exhaust all
available remedies before proceeding to court, Woodford v. Ngo,
548 U.S. 81, 83 (2006), which requires "compliance with an
agency's deadlines and other critical procedural rules . . . ."
Id. at 90.  Since procedures vary from system to system, "it is
the prison's requirements, and not the PLRA, that define the
boundaries of proper exhaustion."  Jones v. Bock, 549 U.S 199,

219 (2007). However, a Plaintiff can successfully counter a defendant's failure to exhaust contention if administrative remedies were not, in fact, available. Chavis v. Goord, 333 Fed.Appx. 641, 643 (2d Cir. 2009) (citing Hemphill v. New York, 380 F.3d 680, 686 (2004)); see also Johnson v. Maha, 460 Fed. Appx. 11, 15 (2d Cir. 2012) (holding that Woodford v. Ngo "does not abrogate the unavailability defense to nonexhaustion." Id. at 15 n.6).

## III. ANALYSIS

### A.   Exhaustion

Defendants argue that Houston failed properly to exhaust available administrative remedies with respect to his dental care, cell flooding, and strip search claims because, as a factual matter, Plaintiff did not submit a grievance of any sort. With respect to Houston's footwear grievances, Defendants argue that Plaintiff's failure to appeal the Inmate Grievance Resolution Committee's ("IGRC") response constitutes inadequate exhaustion of available remedies. Accordingly, Defendant argues that Houston is barred from litigating these claims in federal court under the PLRA.

The Department of Corrections employs a specific grievance procedure known as the Inmate Grievance Resolution Program ("IGRP"). (See Johnson Decl. Ex. H.) The IGRP is designed to

resolve inmate complaints related to "aspects of his/her
confinement that fall within the scope of [the Program]." (Id.
at 1.)  The first step in the process requires the inmate to
complete a written complaint on either an "Inmate Interview
Slip" (Form #143) or an "Inmate Grievance Form" (Form #7101R)
for submission to the IGRC. (Id. at 8.)  However, "[i]f these
forms are not available, a complaint may be submitted on plain
paper." (Id.)  If DOC staff determines that the complaint is
grievable, the Grievance Supervisor or Grievance Officer
conducts an investigation and issues a written response.
(Johnson Decl. ¶ 6.)  Not all complaints relating to a
prisoner's confinement are grievable.  "Grievances that request
actions that are not obtainable via the IGRP, will result in
dismissal at the IGRC level." (Johnson Decl. Ex. H at 2.)

Four levels of appeal are available following the initial
determination.  The inmate can request a formal IGRP hearing,
review by the Warden, review by the Central Office Review
Committee ("CORC"), and review by the Board of Correction
("BOC"). (Johnson Decl. ¶¶ 7-10.)  At each stage in the
process, the inmate must indicate his desire to appeal on the
formal determination form provided to the inmate along with the
applicable reviewing body's decision. (Id.)  Appeals must be
filed within 5 days of the receipt of the committee's written
response to the Grievance. (Id., Ex H. at 9.)

1.   Strip Searches

A material question of fact exists as to whether Houston submitted a grievance regarding his strip searches and filed the relevant appeals in accordance with DOC policies.  Defendants claim that they have no records of Houston's alleged strip search grievance filings.  (Johnson Decl. ¶¶ 12, 13, Ex. A-G.) Houston claims that he did submit a grievance, which he includes as Exhibit N.  Viewed in the light most favorable to Plaintiff, the evidence reduces to competing assertions that cannot be resolved on summary judgment.  See Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir.2004) (noting that courts should "eschew credibility assessments" in ruling on summary judgment motions) (internal citation omitted).

Defendants argue that Plaintiff nevertheless failed properly to exhaust administrative remedies because his subsequent appeal was not submitted on the appropriate form. (See Johnson Decl. ¶ 18) (suggesting that Houston drafted his appeal form himself because its contents, including the typeface and spelling errors contained therein, were inconsistent with official DOC forms).  Houston claims that he was compelled to draft his own form because official appeal forms were unavailable.  (Houston Dep. at 98:10-20.)  It is inappropriate to determine, on summary judgment, whether Houston's allegation that official forms were unavailable is credible. If so, it is

possible that administrative remedies were effectively
unavailable to him. See Barker v. Belleque, No. CIV. 10-0093-AA,
2011 WL 285228 at *4 (D. Or. Jan. 26, 2011) (administrative
remedies effectively unavailable where agency refused to process
appeal filed on wrong form). Alternatively, given that IGRP
procedures explicitly state that initial complaints may be
submitted on plain paper when the proper form is unavailable,
Houston might have reasonably assumed that the same rule applied
to appeals. See e.g,. Giano v. Goord, 380 F.3d 670, 679-80 (2d
Cir. 2004) (failure to exhaust justified where prisoner's
erroneous interpretation of the regulations was reasonable).

Assuming, *arguendo*, that Houston failed to comply with
DOC's grievance procedures, administrative remedies were
nevertheless unavailable for the specific claim he sought to
assert against Webb.  The IGRP explicitly provides that
"allegations of assault or harassment by either staff or inmates
are not grievable . . . ." (Johnson Decl. Ex. H at 2.)
Plaintiff repeatedly alleges that Webb's viewing of his strip
searches constituted "sexual harassment." (SAC. ¶ 42.)  Since
the grievance procedure offered Houston no prospect for relief
related to a harassment claim, Defendants' non-exhaustion
contention cannot succeed.  See Booth v. Churner, 532 U.S. 731,
738 (2001) ("[T]he modifier 'available' requires the possibility
of some relief for the action complained of."). Whether Houston

14

could have filed a different complaint that is grievable under the IGRP — alleging, for instance, a violation of DOC's strip search policy — is of no consequence.  Viewing the record in the light most favorable to Plaintiff, his complaint would have raised a sexual harassment allegation, which is not grievable under DOC's policies.

### 2.   Footwear

Defendants argue that Plaintiff failed to exhaust his administrative remedies by accepting the IGRP's favorable response to his two footwear grievances and declining to submit further appeals.  (See Johnson Decl. Ex. E, F.)  This argument is unpersuasive.  "Where . . . prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners . . . have fully exhausted their available remedies." Abney v. McGinnis, 380 F. 3d 663, 669 (2d Cir. 2004).  Similar to the New York State Department of Correctional Services procedures at issue in Abney, IGRP procedures do not provide a practical means to challenge prison authorities' failure to implement favorable decisions.  An inmate has only five days to appeal a grievance resolution, (Johnson Decl. Ex. H at 10,) which is "insufficient to provide adequate time to assess, in many cases, whether prison officials have implemented a favorable disposition of an inmate's . . . grievance." Abney, 380 F.3d at 668.

15

Defendants also argue that Plaintiff failed to file his grievance within ten days of the initial incident (i.e., within ten days of the initial denial of footwear), which constitutes a failure to exhaust available remedies. As a preliminary matter, the alleged denial of footwear was an ongoing deprivation rather than a discrete incident, suggesting that Plaintiff's grievance may well have been timely. See, e.g. Woodford, 548 U.S. at 121 (questioning whether the "continuing nature of the injury" might render the Plaintiff's grievance timely) (Breyer, J., concurring). Moreover, "the exhaustion requirement of the PLRA is satisfied by the untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority. Hill v. Curcione, 657 F.3d 116, 125 (2d Cir. 2011). Both of Plaintiff's grievances received favorable responses from the IGRC; as such, Houston exhausted his available administrative remedies with respect to his footwear claims.

### 3.   Dental Care and Cell Flooding

The parties dispute whether Plaintiff submitted any grievances or appeals with respect to Houston's dental care and cell flooding claims. Defendants allege that Plaintiff's grievance files do not contain any records related to these claims. (See Johnson Decl. ¶¶ 12-15; Johnson Decl. Ex. A-G.) Similar to Plaintiff's strip search claims, Defendants suggest that Houston's alleged grievance appeals were not submitted on

the official forms.  (See John Decl. ¶ 16.)  Viewed in the light

most favorable to Houston, the evidence once again reduces to

competing assertions about whether Houston submitted the forms

he claims to have filed and whether the official grievance and

appeal forms were actually available.

    B.   Medical Claims

    Houston contends that he received constitutionally

inadequate medical care while in DOC custody.  Specifically, he

alleges that his dental care, footwear provisions, and meals

were improper.  To succeed on such a claim, whether brought

under the Eighth or Fourteenth Amendments, Plaintiff must

demonstrate "deliberate indifference" to a need that is

objectively "serious."  Caiozzo v. Koreman, 581 F.3d 63, 72 (2d

Cir. 2009) (reaffirming the deliberate indifference standard for

threats to health or safety of persons in custody).  "The

standard for deliberate indifference includes a subjective and

an objective component."  Hill, 657 F.3d at 122.  Objectively,

the Plaintiff must demonstrate an actual deprivation of medical

care and that "the inadequacy . . . is sufficiently serious."

Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006).

Subjectively, the Plaintiff must prove that the defendant acted

with "a sufficiently culpable state of mind," which "requires

that the charged official act or fail to act while actually

aware . . . that serious inmate harm [would] result."  Id.

### 1.   Dental Care

Defendants successfully demonstrate that there is no genuine question of material fact regarding Houston's dental care claims. Drawing all reasonable inferences in favor of the Plaintiff, a trier of fact might credit Houston's testimony over Dr. Martin's and determine that oral surgery was required to treat Plaintiff's alleged pain in the upper right portion of his mouth.   But even in this scenario, Houston fails to establish that the inadequate care was sufficiently serious and that Dr. Martin acted with awareness of the harm that would result—-later extraction of five teeth. Houston puts forth no evidence that the teeth he had removed upon his arrival at Five Points (his top front teeth) are the same as those that he initially complained about, or otherwise related to them.   (See SAC ¶ 6; Martin Decl. ¶ 9) (noting Houston's initial complaints about pain in the upper right side of his mouth).   Plaintiff fails to provide evidence that the eventual removal of his front teeth was the result of inadequate care from Dr. Martin. For these reasons, Plaintiff's dental care claims are dismissed.

### 2.   Footwear

Although Houston alleges he did not receive workboots until July, 2012 at the earliest (Houston Dep. at 144:11-25), his contemporaneously kept medical records indicate that he had access to workboots or at least that prison staff believed so.

First, the medical record from Houston's May 3, 2010 appointment
with Dr. Dorinda King-Adekunle, a podiatrist, states that
Houston "ambulates in workboots since discharge from Rickers
Main Island Facility." (Walker Decl., Ex. B.)  Houston was
discharged from Rikers in March 2010, two months before this
appointment.  (Porter Decl., Ex. E.)  The record from that
appointment also states: "consult to DOC to *continue* to wear
workbooks," (emphasis added), suggesting that he already wore
workboots before the appointment and after his transfer to DOC
custody.  (Walker Decl., Ex. B.)

Additional records, including medical reports and Houston's
own grievance submissions, point to the same conclusion.  On
June 21, 2010, for example, Houston was issued a workboot pass
from a physician's assistant with the notation "please *continue*
workboot." (Porter Decl., Ex. I) (emphasis added).  On
September 3, 2010, records from Houston's visit with another
physician's assistant indicate that he inquired about workboots
and the established treatment plan was to "*[c]ontinue* to wear
workboots." (Porter Decl., Ex. J) (emphasis added).  Moreover,
Plaintiff's first grievance related to footwear, filed on June
7, 2011, requested that he "*keep work boots*, in place of medical
boots," (Johnson Decl., Ex. E), suggesting that he already
possessed workboots.  In reply to his second footwear grievance,
filed on August 10, 2011, the IGRP response stated: "You have

19

been given a pair of workboots from the MDC clothesbox, your action requested has been granted." (Johnson Decl., Ex. F at 3.)

Even if the evidence establishes a genuine question of fact as to whether Houston was in fact provided with workboots, Plaintiff offers no evidence to demonstrate that Defendants operated with a "sufficiently culpable state of mind" and an awareness of serious harm that would result. See Salahuddin, 467 F.3d at 263, 279-80. The documentation available indicates that Defendants intended Plaintiff to have access to workboots. Moreover, Houston admits that he rarely wore the prison-issued footwear that he complained about; rather, he generally wore one of two pairs of slippers, which he claims were comfortable and appropriately sized. (Houston Dep. at 149:5-150:19.) He therefore fails to identify a genuine dispute of fact as to whether the alleged deprivation was sufficiently serious. For these reasons, Plaintiff's footwear claims are dismissed.

3. Meals

Viewed in the light most favorable to Plaintiff, the evidence provides a basis for a reasonable jury to conclude that Houston was denied low-sodium halal meals and compelled to choose between maintaining a low-sodium or a halal diet. Houston filed a grievance on September 7, 2010, alleging that Sharon Jones, the MDC dietician, informed him "via [his] 6S

steady 3-11 officer Ms. C," that he "had to change [his] diet
from Muslim to regular because Muslim prisoners don't get
special diet meals-low sodium."  (Johnson Decl., Ex. G at 3.)
Ms. Jones denies that she has ever informed an inmate that he or
she must alter his or her religious practices to receive a
particular diet and claims that she is "not aware of a DOC
policy which requires" it.  (Id. at ¶¶ 6, 8.)  This is not fully
responsive to Houston's allegations, as another officer may
still have informed Houston of his choice and a policy may have
been in place at the time of Houston's incarceration that is no
longer in effect. Jones does not explicitly attest that meals
that were both halal and low-sodium were in fact available to
Plaintiff. In any case, Houston's conflicting testimony creates
a dispute of fact requiring a credibility determination. See
Amnesty Am., 361 F.3d at 122.

　　　DOC's dietary records suggest that Houston was taken off a
low-sodium halal diet.  Prior to September 16, 2010, dietary
logs indicate that Houston received low-sodium halal meals based
on the notations "LS" and "Muslim ID Card."  See, e.g., Pl.'s
Ex. G2.  The September 16 and September 23 lists indicate
Houston's dietary restriction as "xxxx," suggesting that his
meals were neither low-sodium (in contrast to other inmates on
the list with the "LS" notation) nor halal.  Pl.'s Ex. G1 at 1-
2.  On the September 30 log, a handwritten annotation of "LS"

suggests that Houston was put back onto a low-sodium diet, but there is no indication that his meals were halal.  Id. at 3.

Medical records provide additional evidentiary support for Houston's claim. On three separate occasions, Houston complained to a physician's assistant that he was not receiving a low-sodium diet. He first raised this issue with medical staff on October 7, 2010, at which point a low-sodium diet was ordered. (Pl.'s Ex. G at 3.)  He brought the same complaint four days later; a low-sodium diet was once again included in the treatment plan.  (Id. at 4.)  Finally, on December 1, 2010, he alleged that he was still not receiving low-sodium meals, calling into question Defendants' claim that low-sodium meals were provided to all prisoners beginning in November. (Id. at 7.) The records submitted do not establish when, if ever, Houston was restored to a halal diet.

Plaintiff asserts that the alleged denial of low-sodium meals constitutes a violation of the Eighth Amendment under the deliberate indifference standard.  "The denial of a medically prescribed diet may constitute an Eighth Amendment violation under certain circumstances." Rush v. Fischer, 923 F.Supp.2d 545, 555 (S.D.N.Y. 2013) (citations omitted). See, e.g., Mandala v. Coughlin, 920 F.Supp. 342 (E.D.N.Y. 1996) (denying summary judgment where the plaintiff claimed he was not provided with a medically-required high-fiber diet); Johnson v. Harris,

479 F.Supp. 333 (S.D.N.Y. 1979) (holding that the failure to provide a diabetic inmate with an appropriate diet violated the Eighth Amendment).

The first inquiry is whether the denial of low-sodium meals, as a factual matter, resulted in "objectively serious" harm, see Salahuddin, 467 F.3d at 279-80, such that it denied "the minimal civilized measure of life's necessities." Wilson v. Seiter, 501 U.S. 294, 298 (1991).  High blood pressure has been held to constitute a serious medical condition. Baskerville v. Bolt, 224 F.Supp.2d 723, 735 (S.D.N.Y. 2002) (Plaintiff's "prescription for high blood pressure arguably indicates that he may have an objectively serious medical condition that needed to be controlled through medication.") However, Houston fails to offer evidence indicating that in this instance, the interruption of his low sodium meals caused serious harm.

First, prison records suggest that the period of the denial was relatively short.  DOC dietary records indicate that Houston was returned to a low-sodium diet beginning on October 12, 2010. (Jones Decl. Ex. A at 1.)  DOC's dietician claims that all inmates were placed on a low-sodium diet beginning in November, meaning that Houston would have been denied a low sodium diet for less than two months.  (Id. ¶ 16.)  Houston argues that he was not provided with a low-sodium diet until December 2011,

23

when he was transferred to GVRC.  (Houston Dep. at 258:20-259:2.)

Houston's medical records, however, establish that any consequences for his blood pressure were relatively short-lived. On September 3, 2010, while he was still on a low-sodium diet, Houston's blood pressure was 126/80.  (Pl.'s Opp. to Summ. J., Ex. F3.)  By October 7, 2010, after roughly three weeks on a regular diet, his blood pressure was 127/84.  (Id., Ex. G, at 4.)  During this appointment, Houston complained that he "stopped getting [a] low sodium diet," and the doctor ordered a low-sodium diet as the treatment for Plaintiff's hypertension. (Id.)  Houston's blood pressure continued to rise, reaching 140/92 on November 26, 2010.  (Id., Ex. H1.)  By December 1, however, Plaintiff's blood pressure dropped to 134/82, which was accompanied in the medical record by an annotation that his vital signs were "within normal limits."  (Porter Decl., Ex. K.) His blood pressure continued to drop, reaching 120/80 on December 15.  (Id., Ex. L.)  Subsequent medical records indicate that his hypertension was "well controlled" thereafter.  (Pl.'s Opp. to Summ. J., Ex. D.)

These records are consistent with Defendants' position that the denial of low-sodium meals lasted for a period of several weeks rather than the remainder of Houston's stay in DOC custody.  Moreover, Plaintiff fails to provide any evidence that

24

that his somewhat elevated blood pressure, sustained for a period of only a few weeks, amounts to a serious medical condition.  For these reasons, Plaintiff's Eighth Amendment claim with respect to his alleged denial of low-sodium meals is dismissed.

Plaintiff also raises First Amendment and RLUIPA claims arising out of the same facts. Inmates are entitled to reasonable accommodation of religious beliefs, including dietary restrictions. See, e.g., Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003) (It is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."). RLUIPA requires that the government "not 'impose a substantial burden' on the 'religious exercise' of inmates . . . unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." Salahuddin, 467 F.3d at 273 (2d Cir. 2006) (citing 42 U.S.C. § 2000cc-1(a)). The free exercise clause requires limitations on prisoner's religious practices to be "reasonably related to legitimate penological interests" Id. (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)). It remains unclear whether or not the substantial burden requirement must be met in order for a prisoner to state a claim under the Free Exercise Clause, but "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates

25

of their faith does unconstitutionally burden their free exercise rights." Holland v. Goord, 758 F.3d 215, 221 (2d Cir. 2014) (quoting McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir.2004)).

In this case, there is a genuine question of fact as to whether Plaintiff's halal meal requirement was, in his "own scheme of things, religious." Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002) (quoting Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984)). Determining the sincerity of a prisoner's religious beliefs "does not lend itself to a decision on summary judgment." Pugh v. Goord, 571 F. Supp. 2d 477, 498 (S.D.N.Y. 2008); See also Patrick v. LeFevre, 745 F.2d at 157 ("[A]ssessing a claimant's sincerity of belief demands a full exposition of facts and the opportunity for the factfinder to observe the claimant's demeanor during direct and cross-examination.").

Defendants argue that Plaintiff's religious beliefs did not require halal meals, pointing out that Mr. Houston stated in a deposition that if the chicken and goat that he consumed while in prison had not been blessed "as long as I pray over it, it becomes halal." (Houston Dep. 264:16-265:8.) However, other statements in the same deposition suggest that he believes food becomes halal due to "an imam praying over" the animal before its slaughter. (Houston Dep. 249:20-251:12.) Furthermore,

26

Houston identified other types of food that he is not permitted to eat, such as pork (Id. at 262:22-23.) Houston has stated that he attended religious services with an imam while in DOC custody and even requested an imam to attend his dietary grievance proceeding.  (Id. at 265:12-266:10; Johnson Decl., Ex. G at 2.) It is therefore inappropriate to determine, on summary judgment, that Houston's religious beliefs are insincere.

Defendants seek summary judgment on this claim on the basis that Plaintiff was not required to choose between his religious beliefs and adhering to a low-sodium diet. Because Defendants do not argue that the denial of halal meals served a legitimate penological objective, Salahuddin, 467 F.3d at 275, let alone that it furthered a "compelling government interest" through the "least restrictive means," 42 U.S.C. § 2000cc-1(a), Plaintiff's First Amendment and RLUIPA meal claims survive summary judgment.

## C.   Destruction of Property Claims

### 4.   Cell Flooding

To establish a claim for retaliation under the First Amendment, Plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (citing Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001))

(internal quotations omitted). Houston fails to demonstrate
that a reasonable jury could find in his favor on either the
second or third prongs.

First, Houston offers no reasonable basis upon which to
conclude that Cipio intentionally flooded his cell. He did not
witness Cipio cause the flooding (Houston Dep. at 192:2-16), and
no other inmate or staff member informed him that Cipio
intentionally flooded his cell. (Id. at 190:21-191:2.) Houston
finds it to be "common sense" that because Cipio did not move
his documents from the floor he intended them to be destroyed.
(Houston Dep. 191:5-21.) However, even if Cipio were negligent
in attempting to repair the clog without clearing the area in
case of overflow, it would not amount to intentional adverse
action. The fact that Cipio gave Houston a "look" that Houston
interpreted to communicate that he "did it intentionally" is
also insufficient to create an issue of fact. (Houston Dep. at
192:20-193:16.) In sum, Houston's allegation that Cipio flooded
his cell is conclusory.

Furthermore, there is insufficient evidence to support a
plausible connection between Houston's complaint to the warden
and the alleged cell flooding. Houston did not complain
directly to Cipio or witness others passing on his complaint.
(Id. at 194:23-195:8.) As the plumber at MDC, Cipio has no
involvement inmate grievances and is not informed when

grievances are filed.  (Cipio Decl. ¶ 11.)  No aspect of the
record suggests that Cipio was aware of Houston's complaint, let
alone that he intentionally flooded his cell in connection with
that complaint. Absent evidence of a retaliatory motive,
Defendants are entitled to summary judgment on this claim.

### 5.   Destruction of Medication

Plaintiff's First Amendment retaliation claim regarding the
alleged destruction of medication did not survive Defendants'
motion to dismiss, see Houston, 2013 WL 4457375, at *8; however,
Houston did plead an actionable Eighth Amendment claim, which is
subject to a deliberate indifference standard.  See Caiozzo, 581
F.3d at 72. Plaintiff's destruction of medication claim fails to
meet this standard.

First, Plaintiff is unable to establish that Bowers ordered
prison staff to destroy his medication.  In her declaration,
Bowers states that she did not have the authority to order staff
to conduct searches; she did not have knowledge of inmates'
medication regimes; and she does not recall Padmore's informing
her about Houston's grievances.  (Bowers Decl. ¶¶ 7, 9, 11.)
Houston offers no evidence to suggest that these claims are
untrue.  In fact, Houston's deposition makes clear that he has
no reasonable basis upon which to believe that Padmore or Bowers
was even aware of his medication requirements. He acknowledges
that he did not overhear any discussions between Padmore and

Bowers regarding his medication; he never spoke to Bowers regarding his medication; none of the staff searching his cell mentioned Bowers's name; and he never filed a grievance with Bowers regarding his medication.   (Houston Dep. at 212:23-213:4, 213:17-23, 214:3-15, 231:3-7.)   His only basis for claiming that Bowers ordered the destruction of his medication is her alleged statement "[y]eah, you should have dropped dead," which, even if assumed to be true, is insufficient to establish Bowers' involvement in the destruction of his medication. (Id. at 231:12-17.)

Moreover, Plaintiff fails to establish that he experienced objectively serious harm.   Houston claims that he was taken to Elmhurst Hospital on March 22, 2010 to treat a blood clot (Houston Dep. at 6:17-25), but the medical record of that visit indicates that the only diagnosis was "foreign body – esophagus."   (Porter Decl. Ex. P.)   Doctors recommended that he "cut [his] food into smaller pieces and chew more before swallowing."   Id.   Because Plaintiff cannot satisfy either element of the deliberate indifference standard, his destruction of medication claim is dismissed.

D.   Strip Search Claims

While strip searches are usually upheld as reasonable security measures within prisons, they must be "rationally related to a legitimate penological interest to survive First

Amendment scrutiny." Jean-Laurant v. Wilkerson, 438 F.Supp.2d 318, 323-24 (S.D.N.Y. 2006). Similarly, a strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." Id. at 323 (internal citations omitted).

Defendants do not argue that a female officer observing strip searches of a male inmate furthers a legitimate penological interest, particularly in non-emergency situations such as scheduled institutional searches where alternative staffing arrangements can be planned in advance. Rather, Defendants seek summary judgment on the theory that Webb did not, as a factual matter, observe Houston's strip searches. However, the record does not establish that there is no genuine dispute as to the truth of this theory.

Houston testified in his deposition that Webb was present at and observed each of the six alleged strip searches. (SAC ¶ 42, 57; Houston Dep. at 276:7-25, 279:17-280:2.) In response, Defendants rely on two pieces of evidence in addition to Webb's denials: declarations from Hall and Colon, the warden and deputy warden, and log reports from two of the six searches. Both are insufficient to meet Defendants' burden to demonstrate that there is no genuine dispute of fact.

Although Colon and Hall deny ever witnessing Webb observe the strip search of a male inmate, neither is in a position to offer a firsthand account of the six alleged strip searches at issue.  Hall states that he "would be present and observe these searches on occasion," but neither he nor Colon represents that they participated in or witnessed any searches between August 10, 2011 and August 20, 2011.  (Hall Decl. ¶ 8.)  DOC search logs cover only two of the six alleged searches and suggest that Hall and Colon were not present.  (See Webb Ex. A, Ex. B.)

Viewed in the light most favorable to the Plaintiff, the evidence reduces to competing assertions on the part of Houston and Webb.  Weighing these contradictory statements requires a credibility assessment, which is not appropriate at the summary judgment stage.  See Amnesty Am., 361 F.3d at 122 (noting that courts should "eschew credibility assessments" in ruling on summary judgment motions) (internal citation omitted); X v. Bratten, 32 F.3d 564 (4th Cir. 1994) (competing assertions over whether a female guard observed a male inmate's strip search created a genuine issue of material fact that should have precluded summary judgment).  Therefore, Defendants' motion with respect to Plaintiff's strip search claims is denied.

E.    Supervisory Liability

Because Plaintiff's medical and destruction of property claims have been dismissed, there can be no supervisory

liability for these claims. See Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010). In addition, Plaintiff's claims against Brown, Harris, Agro, Halyard-Saunders, Wolf, and Schriro for failing to address his complaints about his specialized diet also fail to withstand summary judgment.

To show supervisory liability for a § 1983 violation, Plaintiff must demonstrate the "personal involvement" of the supervisor in the alleged wrong. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). In Colon v. Coughlin, the Second Circuit enumerated five ways that direct involvement could be shown, including where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." 58 F.3d 865, 873 (2d Cir. 1995). However, following Ashcroft v. Iqbal, 556 U.S. 662 (2009), there has been uncertainty about how the Colon standard should be applied. See Hollins v. City of New York, No. 10-CV-1650(LGS), 2014 WL 836950 (S.D.N.Y. Mar. 3, 2014) (collecting cases); Reynolds v. Barrett, 685 F.3d 193, 206 (2d Cir. 2012) (noting the uncertainty about the "continuing vitality" of Colon but declining to resolve it.) Because Iqbal stated that supervisors could not be held vicariously liable for discrimination by subordinates, some courts have interpreted it as limiting Colon to where a supervisory defendant has directly participated in the rights violation or actively created an unconstitutional policy. See,

e.g. Bellamy v. Mount Vernon Hosp., No. 07-CV-1801(SAS), 2009 WL
1835939 at *6 (S.D.N.Y. June 26, 2009) aff'd, 387 F. App'x 55
(2d Cir. 2010). However, as Judge Baer noted in his opinion
resolving Defendant's motion to dismiss, other judges have held
that Iqbal restricts only those claims that require intent, such
as discrimination or retaliation. Houston, 2013 WL 4457375 at
*11 (citing Hodge v. Sidorowicz, No. 10 Civ. 428(PAC), 2011 WL
6778524, at *16 (S.D.N.Y. Dec. 20, 2011)).

Whatever the status of Colon, "[t]he law is clear. . . that
a prison official's mere response to a grievance, by itself, is
not sufficient to establish personal involvement for purposes of
§ 1983. . . ," although a detailed response may be sufficient.
Watson v. Wright, No. 08-CV-00960, 2013 WL 1791079 at *8
(W.D.N.Y. Mar. 26, 2013), adopted No. 08-CV-960A, 2013 WL
1789578 (W.D.N.Y. Apr. 26, 2013) (quoting Hidalgo v. Kikendall,
No. 08-CV-7536(DC), 2009 WL 2176334, *4 (S.D.N.Y.2009).
Similarly, ignoring a prisoner's letter or complaint is
insufficient to render an official personally liable. Simmons v.
Cripps, No. 12-CV-1061(PAC)(DF), 2013 WL 1290268 at *10
(S.D.N.Y. Feb. 15, 2013), adopted 2013 WL 1285417 (S.D.N.Y. Mar.
28, 2013).

Even assuming Houston's account of the grievances that he
filed to be accurate, there is insufficient evidence to

34

establish the personal involvement of the supervisory

defendants. Houston initially filed a grievance with Brown,

IGRAC Supervisor for MDC, who responded that the issue was non-

grievable. (SAC ¶ 35; Brown Decl. ¶ 16; Johnson Decl., Ex. G.)

This response was a form letter in which Brown had placed an "X"

to indicate that the complaint "[did] not fall under the purview

of the IGRP," (Id.) and is far from the substantive response

required to establish personal involvement. See Rosario v.

Fischer, No. 11-CV-4617(JPO)(FM), 2012 WL 4044901, *5

(S.D.N.Y.2012), adopted 2012 WL 6681695 (S.D.N.Y.2012) ("a pro

forma response to a letter or grievance" is insufficient.).

Houston then claims to have filed an IGRC hearing request

with Harris, Director for IGRC Hearings Program for NYC DOC, and

appeal requests with Agro, the Warden for MDC, Halyard-Saunders,

Assistant Commissioner for Programs Administration and Discharge

Planning for NYC DOC, and Wolf, Director of the Board of

Corrections for NYC DOC. (SAC ¶ 37). All claim that they never

received any such grievance, and none responded.  (D's 56.1 ¶¶

153, 155, 156, 158.) Even resolving this factual dispute in

favor of Houston, receipt of a grievance does not constitute

personal involvement. Simmons, 2013 WL 1290268 at *10.

Otherwise, the exhaustion requirement would lead to supervisory

liability becoming nearly automatic. Id. Finally, Houston wrote

to Commissioner Schriro. Schriro's office has a record of the
letter indicating that she reviewed it and forwarded it to a
subordinate to investigate. (Gobin Decl. ¶¶ 3-10.) Such
delegation is ordinary and appropriate, and is insufficient to
constitute personal involvement. Mateo v. Fischer, 682 F. Supp.
2d 423, 430 (S.D.N.Y. 2010). Accordingly, Defendants' motion for
summary judgment on Plaintiff's claims of supervisory liability
is granted.


## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary
judgment is GRANTED with respect to Plaintiff's claims regarding
dental care, destruction of property, inadequate footwear, and
supervisory liability.  The motion is DENIED with respect to
Plaintiff's claims concerning strip searches and the denial of
low-sodium halal meals.


SO ORDERED.

Dated:     New York, New York
           November 24, 2014


_____
LORETTA A. PRESKA
Chief United States District Judge